UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

FRANCIS HENRY RUGGIERO,

                    Plaintiff,

         -against-

COUNTY OF ORANGE, CORRECTIONAL
OFFICER JOSEPH CAPPELLI (Shield number 362),
CORRECTIONAL OFFICER BRYCE SOTELO
(Shield number 345), CORRECTIONAL OFFICER
DANIEL CAPPELLI (Shield number 522),
SGT. KATHERINE LYONS (Shield number 107),
CORRECTIONAL OFFICER JERRY WARREN
(Shield number 361), individually and in their official
capacity as Orange County Correctional Officers, and
JANE DOE, THE NAME BEING FICTITIOUS, THE
PERSONS INTENDED BEING THE HEAD NURSE
ON DUTY ON AUGUST 8, 2019 AND
AUGUST 9, 2019,

                    Defendants.

------------------------------------------------------------------x

**OPINION AND ORDER**

20-cv-7693 (AEK)

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.**[1]

      Plaintiff Francis Henry Ruggiero ("Plaintiff") brings this action against Defendants

County of Orange, Correctional Officer Joseph Cappelli ("C.O. J. Cappelli"), Correctional

Officer Bryce Sotelo ("C.O. Sotelo"), Correctional Officer Daniel Cappelli ("C.O. D. Cappelli"),

Sgt. Katherine Lyons ("Sgt. Lyons"), and Correctional Officer Jerry Warren ("C.O. Warren")

(collectively "Defendants"), asserting, *inter alia*, claims pursuant to 42 U.S.C. § 1983 for

excessive force, failure to intervene, failure to protect, and conspiracy, as well as state law claims

---

[1] The parties consented to this Court's jurisdiction for all purposes pursuant to 28 U.S.C.
§ 636(c) on October 22, 2021.  ECF No. 43.

for assault and battery and aiding and abetting a tort.[2]  *See generally* ECF No. 21 ("Amended

Complaint" or "Am. Compl.").[3]  Currently before the Court is Defendants' motion for summary

judgment, ECF No. 56, which the Court granted in part and denied in part by text order on

_____

[2] On July 29, 2021, the Honorable Vincent L. Briccetti, the District Judge to whom this case originally was assigned, issued an order granting in part and denying in part Defendants' partial motion to dismiss the Amended Complaint.  ECF No. 34.  The order lists the claims that remained in the action following adjudication of that motion.  *Id.*; *see* Section II (Procedural History), *infra* (listing the 12 claims).

[3] The Amended Complaint included as a named defendant "Jane Doe, the Name Being Fictitious, the Persons Intended Being the Head Nurse on Duty on August 8, 2019 and August 9, 2019."  Plaintiff alleged that "Jane Doe" was an employee of then-co-defendant Wellpath, and that she was "stationed to provide medical services at [the] Orange County Correctional Facility ["OCCF"]."  Am. Compl. ¶¶ 19-20.  Only one cause of action—a state law claim for negligence—was asserted against Wellpath and Jane Doe.  *Id.* ¶¶ 142-49 (nineteenth cause of action).  Wellpath was dismissed from this case by Judge Briccetti on January 13, 2021, based on Plaintiff's failure to effect service on Wellpath or show good cause for his failure to do so.  *See* ECF No. 33.  There is no evidence that Jane Doe was ever identified or served with the summons and complaint in this action, and no one has appeared on her behalf.  Moreover, the nineteenth cause of action is not among the claims that Judge Briccetti ordered "shall proceed" following his decision on Defendants' partial motion to dismiss.  *See* ECF No. 34 at 2.  At best, Plaintiff has abandoned any claim he may have had against Jane Doe.  But even if Plaintiff has not, Plaintiff "has made no attempt to further amend the operative complaint to include the real identit[y] of th[is] individual[].  As discovery has now closed, the proper course is to dismiss the John/Jane Doe Defendant[] without prejudice."  *Santiago v. City of Yonkers*, No. 21-cv-764 (AEK), 2023 WL 2648649, at *14 (S.D.N.Y. Mar. 27, 2023) (quotation marks and alteration omitted).  Accordingly, any claims that Plaintiff might be asserting against "Jane Doe" are dismissed without prejudice.

Moreover, to the extent that any of Plaintiff's Section 1983 claims are asserted against the individual Defendants in their "official capacity," this is the equivalent of asserting those claims against Orange County.  *See Boykin v. Moreno*, No. 17-cv-6869 (KMK), 2020 WL 882195, at *4 (S.D.N.Y. Feb. 24, 2020) ("A claim asserted against a defendant in his [or her] official capacity is in effect a claim against the governmental entity itself for official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.") (cleaned up), *appeal dismissed*, 2020 WL 9718984 (2d Cir. Nov. 20, 2020).  Because Judge Briccetti dismissed the municipal liability claims against Orange County, *see* ECF No. 34, any Section 1983 official capacity claims against the individual Defendants have been dismissed as well.

September 28, 2023, ECF No. 71.  This Opinion and Order sets forth the bases for the Court's decision.

## BACKGROUND

The allegations in the Amended Complaint relate to two separate incidents that allegedly occurred while Plaintiff was incarcerated at the OCCF—one on August 8, 2019, and the other on August 9, 2019.  As explained in Section II of the Discussion section below, however, Plaintiff has abandoned his claims related to the August 8, 2019 incident.  Accordingly, the Court only addresses facts related to the August 9, 2019 incident.

The facts set forth in this section are undisputed unless otherwise noted, and are taken from Defendants' Local Civil Rule 56.1 Statement, ECF No. 62 ("Defs.' 56.1"), Plaintiff's Response to Defendants' Local Civil Rule 56.1 Statement, ECF No. 68 at 1-4 ("Pl.'s 56.1"), Plaintiff's Counterstatement of Material Facts, ECF No. 68 at 4-20 ("Pl.'s Counter 56.1"), and the supporting materials submitted by the parties.

## I.    Factual Background

Plaintiff was incarcerated at the OCCF from August 7, 2019 through August 12, 2019. Defs.' 56.1 ¶ 7.  When he arrived at the OCCF on August 7, Plaintiff had injuries to his left eye, and he informed officers at the jail that these were the result of an altercation with members of the Town of Newburgh Police Department.  *Id.* ¶¶ 8-9.  Plaintiff also had blisters on his feet from wearing sneakers that were too tight, and he was provided a wheelchair for walking for extended periods.  *Id.* ¶ 10; *see* ECF No. 57 ("Pierce Decl.") Ex. LL ("Pl.'s Dep.") at 20:9-21:10.

On August 9, 2019, Plaintiff was housed in Med Unit 1 at the OCCF.  Defs.' 56.1 ¶ 76. The parties dispute what transpired on that date when C.O.s D. Cappelli, J. Cappelli, and Sotelo, among others, entered Plaintiff's cell and forcibly subdued him.

In their Local Civil Rule 56.1 Statement, Defendants recount various statements made and reports submitted by Plaintiff, as well as legal filings by Plaintiff or on his behalf: an inmate grievance form regarding the August 9, 2019 incident, *id.* ¶¶ 77-80; his notice of claim related to this action, *id.* ¶¶ 81-89; a sworn affidavit filed in a different federal lawsuit, *id.* ¶¶ 90-95; his original state court complaint regarding the events at issue here (before the matter was removed to federal court), *id.* ¶¶ 96-101; his New York General Municipal Law Section 50-h hearing testimony, *id.* ¶¶ 102-37; the Amended Complaint filed in this action, *id.* ¶¶ 138-45; a mental health assessment of Plaintiff conducted at the Rockland County Correctional Facility, *id.* ¶¶ 146; a mental health assessment of Plaintiff conducted at the Newburgh Mental Health Clinic, *id.* ¶¶ 147; and Plaintiff's deposition testimony in this action, *id.* ¶¶ 148-80.  Although Defendants characterize these recitations as "material facts as to which there is no genuine issue to be tried," Defs.' 56.1 at 1, it is apparent that the only thing Defendants do not dispute is that Plaintiff made these statements and allegations and provided this testimony—they do not accept Plaintiff's version of the facts.

Plaintiff disputes those portions of Defendants' Local Civil Rule 56.1 Statement that cite to the inmate grievance form, the sworn affidavit filed in a different federal lawsuit, and the mental health assessment at Rockland County Correctional Facility on the ground that they are "improper" statements relying upon inadmissible evidence.  Pl.'s 56.1 ¶¶ 77-80, 90-95, 146.  The Court need not resolve this evidentiary issue, since Plaintiff's version of events can be gleaned from his Section 50-h hearing testimony and his deposition testimony in this case.  While the Federal Rules of Evidence will provide various limitations on the use of this testimony at trial so long as Plaintiff himself is available to testify, Plaintiff, appropriately, has not raised any

evidentiary objections to the Court's consideration of these materials for purposes of resolving Defendants' summary judgment motion.

### A.      Plaintiff's Section 50-h Hearing Testimony

Section 50-h of New York's General Municipal Law provides that "[w]herever a notice of claim is filed against a . . . county, . . . the . . . county . . . shall have the right to demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made, which examination shall be upon oral questions unless the parties otherwise stipulate . . . ."  N.Y. Gen. Mun. Law § 50-h(1).  Plaintiff's 50-h hearing took place on August 21, 2020, and he was represented by counsel at the hearing.  *See* Pierce Decl. Ex. KK ("Pl.'s 50-h Tr.").

At this hearing, Plaintiff testified that on August 9, 2019, he was sitting in his cell and pressing the button to call the corrections officer on duty because he was in "a lot of pain from the injuries that [he] received" from a fight with another inmate on August 8, 2019.  Defs.' 56.1 ¶ 102; *see* Pl.'s 50-h Tr. at 26:10-25, 32:16-20.  The corrections officer contacted the medical unit and eventually communicated to Plaintiff that he would receive his medication during "medication pass," but after another hour or two passed without Plaintiff receiving his medication, Plaintiff pressed the button again to request medical attention.  Pl.'s 50-h Tr. at 32:21-33:10; *see* Defs.' 56.1 ¶ 103.  According to Plaintiff, the officer on duty told him that there was nothing more that he could do because he had called the medical unit already.  Pl.'s 50-h Tr. at 33:11-12.  Plaintiff stated that because he was in so much pain, he removed the arm from his wheelchair, used it to lock the "feed-up slot" of his cell in the open position, and refused to close the slot until medical personnel arrived.  Defs.' 56.1 ¶ 104; *see* Pl.'s 50-h Tr. at 33:13-19. Plaintiff testified that his cell was so cold that he had a towel over his head and a blanket

wrapped around him; he denied having a towel tied and knotted around his neck.  Pl.'s 50-h Tr. at 33:23-25; *see* Defs.' 56.1 ¶¶ 105, 127.  Next, the corrections officer on duty came over to Plaintiff's cell and told him that he needed to close the feed-up slot, and that if Plaintiff refused, the officer would have to call the sergeant.  Pl.'s 50-h Tr. at 34:4-8.  After being told that the sergeant would come to talk to him, Plaintiff let the corrections officer close the feed-up slot; but after another hour passed without speaking to the sergeant, Plaintiff again took the arm off of his wheelchair and popped open the feed-up slot.  *Id.* at 34:15-22.  Plaintiff had one hand outside the feed-up slot so that the officer could not close it and his other hand holding the cell door closed so that no one could open it.  *Id.* at 34:22-35:2.

Sgt. Lyons then arrived at Plaintiff's cell with C.O. D. Cappelli; Plaintiff testified that Sgt. Lyons immediately walked up to his cell door, pulled her walkie-talkie off her belt, and said, "we have one trying to commit suicide."  Defs.' 56.1 ¶ 106; *see* Pl.'s 50-h Tr. at 35:2-7, 44:4-8.  Plaintiff recounted that he told Sgt. Lyons that he was not trying to commit suicide and that he just wanted to be taken to the medical unit.  Pl.'s 50-h Tr. at 35:7-9.

According to Plaintiff, C.O. D. Cappelli then opened the cell door, entered the cell, pushed Plaintiff's wheelchair back, picked Plaintiff up, and slammed him on his face.  Defs.' 56.1 ¶ 107.  C.O. D. Cappelli then took Plaintiff's arms and handcuffed him behind his back; Plaintiff testified that he did not resist at all during this encounter.  *Id.* ¶¶ 108-09.  C.O.s J. Cappelli and Sotelo entered Plaintiff's cell, with C.O. Sotelo on Plaintiff's right side, C.O. J. Cappelli behind Plaintiff, and C.O. D. Cappelli on Plaintiff's left side.  Plaintiff testified that C.O.s Sotelo and D. Cappelli took turns punching Plaintiff in the face on his right and left sides for about twenty minutes, with each of these officers hitting him numerous times.  *Id.* ¶¶ 111-15.  Plaintiff also testified that C.O. J. Cappelli kicked Plaintiff in the area of his mid-back to lower

buttocks.  *Id.* ¶ 116.  Throughout this entire incident, Plaintiff was lying on his stomach and handcuffed behind his back.  *Id.* ¶ 117; *see* Pl.'s 50-h Tr. at 51:9-12, 53:2-6.

Plaintiff testified that he felt his pants and underwear being pulled down and "something being inserted in my rectum," which he believed was a finger.  Defs.' 56.1 ¶ 118.  He did not know which officer did this, but he assumed it was C.O. J. Cappelli.  *Id.* ¶¶ 119-20.  Next, Plaintiff testified that C.O. Sotelo then stood up and began to stomp on Plaintiff's neck and back and kick Plaintiff in the lower back.  *Id.* ¶ 121.  In addition, according to Plaintiff, C.O. Sotelo pulled his pepper spray off of his belt and sprayed it down Plaintiff's throat and in Plaintiff's eyes multiple times.  *Id.* ¶¶ 122-23.  According to Plaintiff, after the incident, he was not placed back into his wheelchair, but was dragged on the floor to the medical unit by two unknown officers while his hands were still handcuffed behind his back.  *Id.* ¶¶ 125-26.  Upon arrival at the medical unit, Plaintiff was taken to the "eye wash station," and then was placed in an examination room where he received stiches.  *Id.* ¶ 129; Pl.'s 50-h Tr. at 61:3-23.  Plaintiff testified that his injuries from this incident consisted of a broken nose, swelling in the back of his head, bruised eyes, crushed discs in his back and neck, and "mental health issues now because of the rape."  *Id.* ¶ 135; *see* Pl.'s 50-h Tr. at 67:24-68:5 (the inside of Plaintiff's mouth was "shredded" from the punches to his face, and he had rectal bleeding).

### B.    Plaintiff's Deposition Testimony

Plaintiff sat for his deposition in this case on March 17, 2022.  Pierce Decl. Ex. LL.  At the deposition, Plaintiff testified that on August 9, 2019, he sought a corrections officer's attention because he wanted medical treatment; specifically, he wanted his seizure medication and help for his feet, and he was in pain from the injuries he sustained the day before.  Defs.' 56.1 ¶¶ 148-49; *see* Pl.'s Dep. at 35:5-36:4.  Plaintiff acknowledged that he opened the "tray

slot" of his cell and refused to close it, and that this was considered to be a security violation at the OCCF.  Defs.' 56.1 ¶¶ 152-53.  He also reiterated his assertion that Sgt. Lyons approached his cell and said that "we have one trying to commit suicide," and that after this, other officers "ripped the door open and started to beat [him] up, picked [him] up out of [his] chair, slammed [him] on [his] face and then handcuffed [him] two seconds after the door was opened."  Pl.'s Dep. at 60:7-20.  In addition, Plaintiff testified that he was "hogtied" by C.Os J. Cappelli and D. Cappelli and was sodomized, but later testified that he did not know if he was "hogtied."  Defs.' 56.1 ¶¶ 154-56.  Plaintiff did not recall whether he received medical treatment on August 9, 2019.  *Id.* ¶¶ 157-58.  He testified that his injuries included a cut over his right eye and injuries to his anus, face, neck, and back, and that he received stitches for the cut over his right eye.  Pl.'s Dep. at 37:11-19.  But Plaintiff could not recall if he received or requested treatment for the injuries to his anus, neck, and back.  Defs.' 56.1 ¶¶ 159-61.

### C.    Defendants' Account of the Events of August 9, 2019

According to Sgt. Lyons, she went to Plaintiff's cell on August 9, 2019, because she received a call from the officer on duty in Plaintiff's unit, who told her that Plaintiff was tampering with the tray slot on his cell door and was yelling.  ECF No. 66 ("Levi Decl.") Ex. A ("Lyons Dep.") at 23:11-24:9.  Sgt. Lyons asked C.O. D. Cappelli to accompany her to Plaintiff's cell.  *Id.* at 24:13-25; *see* Levi Decl. Ex. B ("D. Cappelli Dep.") at 32:11-34:16.  Sgt. Lyons and C.O. D. Cappelli both testified at their depositions that when they arrived at Plaintiff's cell, he had his hand or arm through the slot in his cell, had a ligature around his neck and refused to remove it, and was threatening to "hang up."  Lyons Dep. at 25:23-26:12, 27:10-15; D. Cappelli Dep. at 34:20-35:4, 36:14-37:8, 39:2-7.  At that point, Sgt. Lyons issued a radio transmission about Plaintiff's threat to "hang up," prompting other corrections officers, including

C.O.s J. Cappelli and Sotelo, to arrive at Plaintiff's cell.  Lyons Dep. at 27:23-28:15; D. Cappelli Dep. at 37:9-10, 39:8-24; Levi Decl. Ex. C ("J. Cappelli Dep.") at 39:4-41:6; Levi Decl. Ex. D ("Sotelo Dep.") at 26:14-24, 29:10-13, 30:22-25, 42:17-19.

According to Defendants, they entered Plaintiff's cell for the purpose of removing the ligature that was around Plaintiff's neck.  Lyons Dep. at 31:9-16; D. Cappelli Dep. at 37:11-18; J. Cappelli Dep. at 64:25-65:14; Sotelo Dep. at 35:6-9.  Indeed, Sgt. Lyons testified that she issued orders to C.O. D. Cappelli to force open the door and remove the ligature.  Lyons Dep. at 31:6-16.  When they entered the cell, however, Plaintiff rose from his wheelchair, grabbed at C.O. D. Cappelli's waist, and tried to take C.O. D. Cappelli to the ground.  Lyons Dep. at 29:10-15, 32:14-33:8; D. Cappelli Dep. at 42:23-43:6, 44:11-19; J. Cappelli Dep. at 53:11-15, 54:3-18; Sotelo Dep. at 44:24-45:6.  Plaintiff and C.O. D. Cappelli both ended up on the floor, and C.O. J. Cappelli also ended up on, or close to, the ground.  Lyons Dep. at 33:6-8, 35:19-21; D. Cappelli Dep. at 44:11-14, 45:12-16; J. Cappelli Dep. at 54:25-55:3, 56:25-57:10.  A struggle then ensued, during which C.O. J. Cappelli sprayed Plaintiff with O.C. spray and then wrestled with Plaintiff for control of the O.C. spray can; according to C.O. J. Cappelli, Plaintiff attempted to bite his hand during the struggle.  Lyons Dep. at 35:6-21; D. Cappelli Dep. at 45:4-21, 54:11-13; J. Cappelli Dep. at 53:11-55:11, 57:11-18; Sotelo Dep. at 31:19-32:3, 45:17-25, 53:13-14.  C.O. Sotelo then delivered a series of closed fist strikes to Plaintiff's lower torso area in order to gain control over Plaintiff.  J. Cappelli Dep. 60:5-12, 61:7-11; Sotelo Dep. at 31:19-32:3, 33:8-19.  C.O. J. Cappelli testified that once he was able to re-gain control of his O.C. spray can, the corrections officers were able to get Plaintiff's hands behind his back and secured in temporary hand restraints, at which point "the incident was over."  J. Cappelli Dep. at 67:4-22.

D.      **Video Evidence**

Overhead video taken at the OCCF on August 9, 2019,[4] which does not contain any

audio, shows the following:

- Sgt. Lyons and C.O. D. Cappelli arrive at Plaintiff's cell door.  Defs.' 56.1
  ¶ 181; *see* Pierce Decl. Ex. T (Booking Video) at 11:46:03.[5]

- Sgt. Lyons speaks into her walkie talkie.  Defs.' 56.1 ¶ 182; *see* Booking
  Video at 11:46:08-10.

- Three officers quickly proceed to Plaintiff's cell.  Defs.' 56.1 ¶ 183; *see*
  Booking Video at 11:46:24.

- C.O. D. Cappelli opens Plaintiff's cell door.  Defs.' 56.1 ¶ 184; *see*
  Booking Video at 11:46:28.

- Five officers—including Sgt. Lyons, C.O. D. Cappelli, C.O. J. Cappelli,
  and C.O. Sotelo—enter Plaintiff's cell.  *See* Booking Video at 11:46:29-
  33.  Shortly after the officers enter, Plaintiff ends up on the ground, with
  multiple officers on or near the floor around him.  Pl.'s Counter 56.1 ¶ 8;
  *see* Booking Video at 11:46:29-33.

- One of the officers can be seen administering a kick to Plaintiff while he is
  on the ground.  Pl.'s Counter 56.1 ¶ 11; *see* Booking Video at 11:46:42.

- C.O. Sotelo can be seen administering a series of blows in rapid
  succession to Plaintiff.  *See* Pl.'s Counter 56.1 ¶ 13; Booking Video at
  11:47:02-07.[6]

---

[4] Defendants have provided the Court with two different overhead videos, both of which
were submitted as Exhibit T to the Pierce Declaration.  The "booking video" is from the vantage
point of a camera pointed toward Plaintiff's cell, and it shows both the area outside of the cell
and a limited view inside the cell when the cell door is opened.  The "hallway video" is from the
vantage point of a camera positioned high on the wall along which Plaintiff's cell is located, with
the camera pointed outward and away from the cell; this video only shows the area outside of
Plaintiff's cell.  The Court uses the terms "booking video" and "hallway video" based on the
electronic filenames associated with the videos submitted as Exhibit T to the Pierce Declaration.

[5] The Court relies upon the parties' undisputed identifications of the officers seen in the
video.  *See* Pl.'s Counter 56.1 ¶ 2 (noting that in the video, Sgt. Lyons "is seen walking towards
[Plaintiff's] cell" with C.O. D. Cappelli); Booking Video at 11:45:56.

[6] It is unclear from the video precisely how many times C.O. Sotelo punched Plaintiff or
where exactly he punched Plaintiff since the view into Plaintiff's cell is partially blocked by the

- One of the officers can be seen holding a handheld camera inside Plaintiff's cell.  Defs.' 56.1 ¶ 187; *see* Booking Video at 11:47:42.

- While standing outside of Plaintiff's cell, Sgt. Lyons speaks to another officer who has arrived at the scene, points to Plaintiff's cell, and motions to her neck.  Defs.' 56.1 ¶ 189; *see* Pierce Decl. Ex. T (Hallway Video) at 11:48:13-16.

- Medical staff arrives and enters Plaintiff's cell.  Defs.' 56.1 ¶ 188; *see* Booking Video at 11:49:31-50.

- Plaintiff is brought out of his cell in a wheelchair.  Defs.' 56.1 ¶ 190; *see* Booking Video at 11:52:03.[7]

A handheld video taken inside Plaintiff's cell on August 9, 2019 shows C.O. D. Cappelli using a knife to cut off a towel that is tied around Plaintiff's neck.  Defs.' 56.1 ¶¶ 191-92; *see* Pierce Decl. Ex. U, Part 1 at 00:21-25.[8]  At that point, Plaintiff is handcuffed behind his back and his legs are secured in shackles.  Defs.' 56.1 ¶ 193.  Plaintiff is wearing a white one-piece

---

[7] wall and partially blocked by Sgt. Lyons who, during those seconds, was walking in and out of the doorway to Plaintiff's cell.  From the video it appears that almost immediately after C.O. Sotelo stopped punching Plaintiff, Plaintiff was subdued.  *See* Booking Video at 11:47:10.

[7] Although Plaintiff does not dispute Defendants' recitation in their Local Civil Rule 56.1 Statement of what the overhead booking video shows, Plaintiff provides a different description of that video in his Counterstatement of Material Facts.  *See* Pl.'s Counter 56.1 ¶¶ 1-14.  For example, Plaintiff, through counsel, asserts that while waiting for other officers to respond to Sgt. Lyons's radio transmission, "neither [Sgt.] Lyons nor [C.O.] D. Cappelli say anything or issue any orders to [Plaintiff]."  *Id.* ¶ 5.  Notably, however, there is no audio in the overhead video.  Moreover, Plaintiff, through counsel, states that the video shows C.O. D. Cappelli lifting Plaintiff out of his wheelchair and slamming him on the ground, and that "[a]t no point did [Plaintiff] engage D. Cappelli."  *Id.* ¶ 7.  But the view into Plaintiff's cell in the booking video is obstructed by the wall outside the cell, and it is not entirely clear what happened in the seconds after the officers entered the cell.  What is evident is that Plaintiff ended up on the ground within a matter of seconds, with the officers going down to the floor around him.  *See* Pl.'s Counter 56.1 ¶ 8; *see* Booking Video at 11:46:29-33.

[8] One of the officers inside of Plaintiff's cell announces at the outset of the handheld video that the time is 11:46 a.m.; the booking video, however, first shows an officer holding a handheld camera inside Plaintiff's cell at 11:47:42.  *See* Booking Video at 11:47:42.  Again, the Court relies upon the parties' undisputed identification of C.O. D. Cappelli as the officer who cut off the towel.

jumpsuit with seven snaps, the lower five of which are closed. *Id.* ¶¶ 194-95; *see* Pierce Decl. Ex. U, Part 1 at 00:33. Plaintiff's nose is bleeding, and blood is dripping onto the front of his jumpsuit. Defs.' 56.1 ¶ 196; *see* Pierce Decl. Ex. U, Part 1 at 00:39. Next, it appears that Plaintiff suffers a seizure, and the officers lay him on the floor of the cell. Defs.' 56.1 ¶ 197; *see* Pierce Decl. Ex. U, Part 1 at 00:39-01:25. Less than two minutes later, medical staff arrives and starts to treat Plaintiff. Defs.' 56.1 ¶ 198; Pierce Decl. Ex. U, Part 1 at 2:14. After a couple of minutes, Plaintiff says, "I can get up," and he is helped into a wheelchair while saying, "I can walk, I can walk." Defs.' 56.1 ¶ 199; *see* Pierce Decl. Ex. U, Part 1 at 4:11-4:20. Plaintiff is then taken in the wheelchair to the medical unit, where he receives medical treatment, including sutures around his right eyebrow. Defs.' 56.1 ¶¶ 200, 209.

## II.   Procedural History

Plaintiff commenced this action in New York State Supreme Court, Orange County on August 7, 2020, and Defendants removed the case to federal court on September 18, 2020. ECF No. 1. The operative Amended Complaint was filed on October 19, 2020. ECF No. 21. On July 29, 2021, Judge Briccetti granted in part and denied in part Defendants' partial motion to dismiss the Amended Complaint. ECF No. 34; *see* footnote 2, *supra*. Following Judge Briccetti's decision, the following claims remained in the case:

> i.   First Cause of Action for Assault and Battery against C.O.s J. Cappelli, D. Cappelli, and Sotelo;
>
> ii.  Second Cause of Action for Aiding and Abetting a Tort against Sgt. Lyons;
>
> iii. Third Cause of Action for Negligence against C.O.s J. Cappelli, D. Cappelli, Sotelo, and Warren, and Sgt. Lyons;
>
> iv.  Seventh Cause of Action for Negligent Hiring and Retention against Orange County regarding C.O.s J. Cappelli, D. Cappelli, and Sotelo, and Sgt. Lyons;

v.   Eighth Cause of Action for Failure to Intervene in violation of Section 1983 against C.O. Warren and Sgt. Lyons;

vi.   Ninth Cause of Action for Failure to Protect in violation of Section 1983 against C.O.s J. Cappelli, D. Cappelli, Sotelo, and Warren, and Sgt. Lyons;

vii.   Eleventh Cause of Action for violation of Section 1983 against C.O.s J. Cappelli, D. Cappelli, Sotelo, and Warren, and Sgt. Lyons;

viii.   Twelfth Cause of Action for violation of Plaintiff's Fourteenth Amendment rights insofar as deliberate indifference claims for parole violators are analyzed under the Fourteenth Amendment, and not the Eighth Amendment[9];

ix.   Thirteenth Cause of Action for violation of Plaintiff's Eighth Amendment rights against C.O.s J. Cappelli, D. Cappelli, Sotelo, and Warren, and Sgt. Lyons;

x.   Fourteenth Cause of Action for Conspiracy in violation of Section 1983 against C.O.s J. Cappelli, D. Cappelli, and Sotelo, and Sgt. Lyons;

xi.   Fifteenth Cause of Action for Use of Unreasonable and Excessive Force in violation of Section 1983 against C.O.s J. Cappelli, D. Cappelli, and Sotelo, and Sgt. Lyons; and

xii.   Sixteenth Cause of Action for Failure to Intercede in violation of Section 1983 against C.O.s J. Cappelli, D. Cappelli, Sotelo, and Warren, and Sgt. Lyons.

ECF No. 34 at 2.  Following the completion of discovery, the Court set a briefing schedule for Defendants' motion for summary judgment.  *See* ECF Nos. 52-53.  Defendants' motion papers were filed on September 9, 2022, ECF Nos. 56-63; Plaintiff filed his opposition to Defendants' motion on October 24, 2022, ECF Nos. 66-68; and Defendants submitted their reply on November 14, 2022, ECF Nos. 69-70.

---

[9] Though this is how Judge Briccetti described the twelfth cause of action in his July 29, 2021 order, the twelfth cause of action appears to have been pled as an equal protection claim, *see* Am. Compl. ¶¶ 115-18, which was among the claims that Judge Briccetti dismissed as abandoned, *see* ECF No. 34 at 1.

**DISCUSSION**

## I.     Summary Judgment Legal Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 320-23 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, a court is required to "resolv[e] all record ambiguities and draw[] all factual inferences in favor of the non-moving party." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 145 (2d Cir. 2007); *see also Anderson*, 477 U.S. at 261 n.2; *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir. 2002); *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 97 (2d Cir. 2001). A party cannot overcome summary judgment by relying on "mere speculation or conjecture as to the true nature of the facts" because "conclusory allegations or denials" cannot "create" genuine disputes of material fact "where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quotation marks omitted). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson*, 477 U.S. at 255; *accord Williams v. N.Y.C. Housing Auth.*, 61 F.4th 55, 76 (2d Cir. 2023). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of N.Y.*, 957 F.2d 961, 975 (2d Cir. 1992) (citing *H.L. Hayden Co. v. Siemens Med. Sys. Inc.*, 879 F.2d 1005, 1011 (2d Cir. 1989)).

## II.     Plaintiff Has Abandoned Several Claims

Plaintiff has failed to respond to the arguments advanced in Defendants' motion as to certain claims, and the Court therefore concludes that these claims have been abandoned. "Where a partial response to a [summary judgment] motion is made—*i.e.*, referencing some claims or defenses but not others—. . . in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." *Jackson v. Federal Exp.*, 766 F.3d 189, 197-98 (2d Cir. 2014).

First, Plaintiff has offered no arguments whatsoever with respect to his claims related to the incident on August 8, 2019 involving the alleged failure of C.O. Warren to prevent an altercation between Plaintiff and another OCCF detainee. *See*, *e.g.,* Levi Decl. ¶ 3 ("The present action stems from an incident on August 9, 2019 . . ."). Consequently, Plaintiff has abandoned any claims, or portions of any claims, related to the alleged events of August 8, 2019. Accordingly, Defendants' motion for summary judgment as to any and all claims arising from the events of August 8, 2019 is GRANTED. Because the only claims against C.O. Warren are claims in connection with the August 8, 2019 incident, Defendants' motion for summary judgment as to C.O. Warren is GRANTED in its entirety, and C.O. Warren is dismissed from this action.

Second, Plaintiff also has failed to respond substantively to Defendants' arguments regarding: (1) dismissal of the eleventh, twelfth,[10] and sixteenth causes of action as duplicative, *see* ECF No. 58 ("Defs.' Mem.") at 24; (2) dismissal of the thirteenth cause of action for

---

[10] In his memorandum of law, Plaintiff references the twelfth cause of action as a claim for excessive force, *see* ECF No. 67 ("Pl.'s Mem.") at 9, 16. But as noted in footnote 9, *supra*, the twelfth cause of action, which is more properly read as an equal protection claim, was previously dismissed as abandoned. The Court interprets Plaintiff's Section 1983 claim for excessive force as being properly pled via the fifteenth cause of action. *See* Section III.A, *infra*.

excessive force under the 8th Amendment in light of the parallel claim in the fifteenth cause of action for excessive force under the 14th Amendment, *see* Defs.' Mem. at 25; (3) dismissal of the third cause of action for negligence, *see* Defs.' Mem. at 26-27; and (4) dismissal of the seventh cause of action for negligent supervision, hiring, monitoring, training, and retention, *see* Defs.' Mem. at 27-28.[11]  In light of Plaintiff's failure to address any of Defendants' substantive arguments related to these claims, the Court deems Plaintiff to have abandoned these claims as well.  Accordingly, Defendants' summary judgment motion is GRANTED as to the third, seventh, eleventh, twelfth, thirteenth, and sixteenth causes of action.

Although Defendants also contend that Plaintiff has abandoned claims regarding his injuries by failing to address their arguments about them, *see* ECF No. 70 ("Reply Mem.") at 4, Plaintiff does not assert a standalone cause of action for these injuries; rather, he maintains that he suffered these injuries as a result of the use of excessive force on August 9, 2019, and that damages should be awarded based on these injuries.  Plaintiff has opposed Defendants' motion for summary judgment as to his excessive force claim, and has not abandoned his ability to seek damages for injuries resulting from that use of force, should he be able to provide evidence at trial sufficient to demonstrate his entitlement to such damages.

---

[11] The only discussion in Plaintiff's memorandum of law regarding the third and seventh causes of action is in a short section at the end of the brief, where Plaintiff asserts that these state law causes of action should not be dismissed based on the timing of his Section 50-h hearing. *See* Pl.'s Mem. at 21-22.  That argument is discussed further in Section IV, *infra*, in connection with Plaintiff's first and second causes of action, both of which also arise under New York State law.  Critically for the Court's abandonment analysis regarding the third and seventh causes of action, however, Plaintiff does not address Defendants' argument that the negligence claim fails because Plaintiff also has alleged intentional conduct by C.O. D. Cappelli, C.O. J. Cappelli, and C.O. Sotelo, nor does he address Defendants' argument as to the negligent supervision claim that that there is no evidence in the record of any propensity for, or prior history of, misconduct by the individual Defendants.  *See* Defs.' Mem. at 26-28.

III.     **Plaintiff's Remaining Section 1983 Claims**

A.      **Excessive Force (Fifteenth Cause of Action)**

Plaintiff brings a Section 1983 claim for excessive force against C.O. J. Cappelli, C.O. D. Cappelli, C.O. Sotelo, and Sgt. Lyons.  It is undisputed that Plaintiff was incarcerated at the OCCF from August 7-12, 2019, following his arrest for petit larceny and a parole violation. Defs.' 56.1 ¶ 7; *see* Pl.'s Dep. at 9:23-10:14.  Plaintiff was therefore being held in custody at the OCCF either as a pretrial detainee (for the petit larceny charge) or as a parole violator.[12]  "The law is unclear as to whether or not an alleged parole violator should be treated as a convicted prisoner or a pretrial detainee" for purposes of assessing allegations of excessive force. *Jenkins v. Medert*, No. 16-cv-1491 (MAD) (DJS), 2018 WL 4328823, at *2 (N.D.N.Y. Sept. 11, 2018). Both Defendants and Plaintiff purport to analyze Plaintiff's excessive force claim using the standard applicable to pretrial detainees, Defs.' Mem. at 7-8, Pl.'s Mem. at 9-10, and the Court therefore adopts this as the appropriate legal framework to apply in these circumstances.[13]

"The Fourteenth Amendment's 'Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.'" *Brooks v. Westchester Cnty. Jail*, No. 19-cv-10901 (PMH), 2021 WL 3292229, at *5 (S.D.N.Y. Aug. 2, 2021) (quoting *Gerard v. City of New York*, 843 F. App'x 380, 382 (2d Cir. 2021) (summary order)).  "Establishing excessive

---

[12] Defendants' motion papers are inconsistent as to Plaintiff's status at the facility—at one point Defendants state that Plaintiff was being held as a parole violator, *see* Defs.' Mem. at 3 n.3, but elsewhere they state that he was a pretrial detainee, *see id.* at 25.  Nothing in Plaintiff's submission provides any greater clarity on this question.

[13] Although Plaintiff clearly intended to discuss the excessive force standards applicable to a pretrial detainee, Plaintiff's memorandum of law includes multiple citations to *Graham v. Connor*, 490 U.S. 386 (1989), a decision that applies the "objective reasonableness" standard of the Fourth Amendment to allegations regarding the use of excessive force during the course of an investigatory stop and arrest.  *See id.* at 388; Pl.'s Mem. at 9-11.

17

force under [the Fourteenth Amendment] standard requires that Plaintiff show only that the force purposely or knowingly used against him was objectively unreasonable." *Brooks*, 2021 WL 3292229, at *5 (quotation marks omitted).  "[T]he relevant standard is objective and requires Plaintiff to establish that the force was not rationally related to a legitimate governmental objective or [was] excessive in relation to that purpose." *Id.* (cleaned up).  Where, as here, the parties do not dispute that force was purposely used, the only issue for the Court to decide is whether the force was objectively reasonable. *Id.* at *6.  "[T]o answer that question, a court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* (cleaned up).  The non-exhaustive list of factors considered by a court in making this determination are:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.  The factfinder must also take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate.

*Frost v. New York City Police Dep't*, 980 F.3d 231, 252 (2d Cir. 2020) (cleaned up).

### 1.    Claim Against C.O. J. Cappelli, C.O. D. Cappelli, and C.O. Sotelo

Based on the OCCF video footage that has been submitted in connection with this motion, there is no dispute that several officers, including C.O. J. Cappelli, C.O. D. Cappelli, and C.O. Sotelo, entered Plaintiff's cell, a physical altercation ensued, and approximately 30-35 seconds into the incident, C.O. Sotelo, while positioned above or on top of Plaintiff, administered a series of blows to Plaintiff's body in rapid succession. *See* Booking Video at 11:46:29-11:47:10.  But as Defendants themselves acknowledge, it is impossible to see in the

overhead "booking video" the entirety of what happened inside Plaintiff's cell, even though the

door to the cell is open.  *See* Reply Mem. at 9 ("the only portion of Plaintiff's body that can be

seen is his feet—as the remainder of Plaintiff's body is blocked by the concrete cell wall").  This

is especially true for the seconds immediately following the officers' entry into Plaintiff's cell—

Plaintiff has testified that he was not resisting at all at that point, Pl.'s 50-h Tr. at 35:19-20, and

Defendants have stated that Plaintiff immediately attempted to take C.O. D. Cappelli to the

ground and struggled significantly with C.O.s D. Cappelli and J. Cappelli in particular, Lyons

Dep. at 29:10-15, 32:14-33:8, 35:7-9; D. Cappelli Dep. at 42:23-43:6, 44:11-19, 45:4-21, 54:11-

13; J. Cappelli Dep. at 53:11-55:25, 56:25-57:10; Sotelo Dep. at 44:24-45:6.  C.O. Sotelo

testified at his deposition that during the altercation, Plaintiff was trying to bite the hand of C.O.

J. Cappelli and grab his can of O.C. spray, so C.O. Sotelo "delivered a couple of blows to

[Plaintiff's] body so we could gain control."  Sotelo Dep. at 31:19-32:3; *see id.* at 33:8-11 (the

blows "were more to the lower torso"); *see also* J. Cappelli Dep. at 60:5-61:11 (C.O. Sotelo

delivered "closed fist strikes" to Plaintiff's lower torso area as Plaintiff "was attempting to bite

me and grab the [O.C. spray] can").  Meanwhile, Plaintiff testified that he was subjected to

repeated blows to the face from C.O. D. Cappelli and C.O. Sotelo during the incident.  Pl.'s 50-h

Tr. at 35:23-36:14, 46:22-48:24.

     The handheld video taken inside of Plaintiff's cell in the aftermath of the altercation

shows that Plaintiff's nose was bleeding, *see* Pierce Decl. Ex. U, Part 1, and that Plaintiff ended

up getting stitches near his right eyebrow, *id.* at 21:49-end & Part 2 at 0:00-9:18.  Plaintiff

maintains that he was punched in the face, and he testified at his § 50-h hearing that, among

other injuries, he suffered a fractured nose and bruised eyes as a result of the incident.  Pl.'s 50-h

Tr. at 66:23-67:3; *see* Pl.'s Counter 56.1 ¶¶ 31-32.[14]  Sgt. Lyons, C.O. D. Cappelli, C.O. J.

Cappelli, and C.O. Sotelo did not know how Plaintiff suffered the injuries to his face.  Pl.'s

Counter 56.1 ¶¶ 51, 80, 136, 176; *see* Lyons Dep. at 33:17-34:4, D. Cappelli Dep. at 49:19-

50:20, J. Cappelli Dep. at 61:15-62:9, 69:18-70:17, Sotelo Dep. at 39:22-40:2, 46:23-47:4.

In sum, the parties do not dispute that force was used, but there are substantial differences

between Plaintiff's version and Defendants' versions of the nature and extent of the force that

was used, and why the officers used force on Plaintiff during the course of the incident.  These

significantly different accounts present multiple material issues of disputed fact.  It is not

possible to evaluate the reasonableness of the Defendant officers' use of force here without

making the types of credibility determinations that must be reserved for the finder of fact at trial.

At bottom, there are issues of fact as to whether the use of force was objectively reasonable,

which preclude the resolution of Plaintiff's excessive force claim as a matter of law.

Defendants contend that Plaintiff's provision of discrepant details in his various reports

and testimonies as to what transpired on August 9, 2019 necessitates an award of summary

judgment as to Plaintiff's excessive force claim.  *See* Defs.' Mem. at 8-15.  Without question,

certain aspects of Plaintiff's accounts of the incident are flatly contradicted by the video

evidence: (i) whereas Plaintiff testified that he was subjected to excessive force for

approximately twenty minutes, the video makes clear that the physical encounter between

Plaintiff and C.O.s D. Cappelli, J. Cappelli, and Sotelo lasted for approximately one minute,

*compare* Defs.' 56.1 ¶ 111 *with* Booking Video at 11:46:29-11:47:10; (ii) whereas Plaintiff

---

[14] Medical records submitted by Defendants reflect that a CT scan of Plaintiff's facial bones performed on August 11, 2019, two days after the incident, showed that Plaintiff suffered a nondisplaced right nasal bone fracture.  *See* Pierce Decl. Ex. HH at 32 (using the page numbering provided by the Court's electronic case filing system).

testified that he was dragged on the floor from his cell to the medical unit after the incident, the booking video makes clear that he was taken from his cell to the medical unit in a wheelchair, *compare* Defs.' 56.1 ¶¶ 125-26 *with* Booking Video at 11:52:00-18; (iii) whereas Plaintiff denied having a towel tied and knotted around his neck, the handheld video makes clear that C.O. D. Cappelli used a knife to cut a towel off from around Plaintiff's neck once Plaintiff was subdued, *compare* Defs.' 56.1 ¶¶ 105, 127 *with* Pierce Decl. Ex. U, Part 1 at 00:21-25; and (iv) whereas Plaintiff testified that he was sexually assaulted by one of the officers, Pl.'s 50-h Tr. at 36:14-19, the handheld video reveals that at the time of the altercation, Plaintiff was wearing a one-piece OCCF jumpsuit with several snap closures in the front, *see* Pierce Ex. U, Part 1 at 00:30, making it at best implausible that any corrections officer could have opened the jumpsuit, pulled it down, and sexually assaulted Plaintiff during the approximately one-minute physical struggle.

Yet despite these evident inaccuracies, Plaintiff's allegations and testimony have remained generally consistent on a number of key points as to what occurred on August 9, 2019. According to Plaintiff, Sgt. Lyons radioed that he was "hanging up," even though Plaintiff maintains that he was not, Pl.'s 50-h Tr. at 35:3-9; as a result, C.O.s D. Cappelli, J. Cappelli, and Sotelo entered Plaintiff's cell and, after they had Plaintiff on the ground and handcuffed behind his back, they assaulted him, *id.* at 35:10-37:9. Moreover, even with certain discrepancies in Plaintiff's various complaints and testimonies, his allegations are not entirely uncorroborated. Rather, from the video evidence, it is apparent that following a radio transmission from Sgt. Lyons, C.O.s D. Cappelli, J. Cappelli, and Sotelo entered Plaintiff's cell and ended up in a physical altercation with him. *See* Booking Video at 11:46:29-11:47:10. The video evidence further establishes that as a result of that physical struggle, Plaintiff suffered injuries. *See* Booking Video at 11:49:31-50 (arrival of medical staff); Pierce Decl. Ex. U, Part 1 at 00:39-

00:45 (bleeding from his nose), 21:49-end & Part 2 at 0:00-9:18 (getting stitches near right

eyebrow).  As to whether the amount of force used was objectively reasonable, resolution of that

issue will depend on how a jury weighs the credibility of the parties' testimony at trial.  At the

summary judgment stage a district court "should not weigh evidence or assess the credibility of

witnesses."  *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

      Contrary to Defendants' contention, this is not "the rare circumstance where the plaintiff

relies almost exclusively on his [or her] own testimony, much of which is contradictory and

incomplete . . . ."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).  In *Jeffreys*, the

Second Circuit affirmed the district court's grant of summary judgment in a Section 1983 action

where the plaintiff claimed that New York City police officers assaulted him and threw him out

of the third-story window of a school building during the course of placing him under arrest. 426

F.3d at 551-52.  Jeffreys, who relied "almost exclusively on his own testimony" in opposing the

defendants' motion for summary judgment, *id.* at 551, had given contradicting accounts of what

had happened, and on three separate occasions "confessed to having jumped out of the third-

story window of the school building," *id.* at 552.  Further, he could not identify any of the

individual officers who participated in the alleged attack, nor could he provide any description of

how they appeared on the night in question; in fact, in an interview with police just two days

after the incident, Jeffreys stated that "the first time he saw any police officers was when he was

on the ground outside the school."  *Id*.  The *Jeffreys* panel noted that while there were many

material issues of fact disputed in the case, the district court did not err in granting summary

judgment in favor of the defendants because no *genuine* issue of material fact existed because

"no reasonable person could believe Jeffreys's testimony."  *Id.* at 554-55.

This matter is not at all comparable.  Rather, Plaintiff's accounts of the events of August 9, 2019 are consistent in many core respects, and aspects of Plaintiff's central accusations are consistent with the video evidence in the record.  Accordingly, Defendants here cannot "meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor."  *Id.* at 554.  Without question, the divergence between Plaintiff's testimony and the video evidence presents a major obstacle for Plaintiff in terms of the jury's assessment of his credibility at trial.  *See Shepherd v. Mayer*, No. 13-cv-6142 (NG) (PK), 2018 WL 679456, at *3 (E.D.N.Y. Jan. 31, 2018) ("Plaintiff's version of events is . . . not sufficiently 'disconnected' from other evidence for me to conclude that *no* rational juror would credit it.  Whether the discrepancies in plaintiff's evidence amount to contradictions that adversely affect plaintiff's credibility is a matter for the jury." (emphasis in original)).  But at this stage, resolving all record ambiguities and drawing all factual inferences in favor of Plaintiff, there are material issues of fact as to Plaintiff's excessive force claim against C.O. J. Cappelli, C.O D. Cappelli, and C.O. Sotelo, and summary judgment is not warranted as to those Defendants on this claim.

### 2.    Claim Against Sgt. Lyons

Plaintiff maintains that a reasonable jury could find Sgt. Lyons liable for the use of excessive force based on her actions as a supervisor on August 9, 2019.  Pl.'s Mem. at 19.

To establish liability for any individual defendant pursuant to Section 1983, a plaintiff must demonstrate "that 'each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  "The factors necessary to establish a § 1983 violation will vary with the constitutional provision at issue because the

23

elements of different constitutional violations vary." *Id.* at 618 (cleaned up).  Therefore, "[t]he violation must be established against the supervisory official directly" through his or her own individual conduct as it relates to the specific, underlying offenses at issue.  *Id.*  Plaintiff's succinct argument on this point relies entirely on the Second Circuit's decision in *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001), which explained—long before the issue of supervisory liability was clarified in *Tangreti*—that "direct participation" by a supervisor in a constitutional violation "requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal."  262 F.3d at 155 (footnote omitted).  The record here is not sufficient to establish that Sgt. Lyons's own individual conduct gives rise to viable a claim against her for excessive force.

Plaintiff contends that Sgt. Lyons set the events of August 9, 2019 in motion by falsely transmitting to other officers that Plaintiff was attempting to commit suicide, even though Plaintiff allegedly told Sgt. Lyons that he was not trying to harm himself.  *See* Pl.'s Mem. at 19; Pl.'s 50-h Tr. at 35:5-9.  Meanwhile, Sgt. Lyons testified at her deposition that when she and C.O. D. Cappelli arrived at Plaintiff's cell, Plaintiff had a ligature around his neck, and when they asked Plaintiff to remove it, he said "I'm hanging up.  I'm going to hang up."  Lyons Dep. at 27:10-15.  Sgt. Lyons explained that she then made her radio transmission because she believed Plaintiff's life was in danger.  *Id.* at 27:24-28:10; *see id.* at 39:19-22 ("Since this was an emergent situation, that in your eyes, then you guys had to enter as soon as possible?  A.  Yes.").  The only evidence in the record of any orders given by Sgt. Lyons in connection with the entry into Plaintiff's cell is her testimony that she ordered C.O. D. Cappelli to force open the door and remove the ligature.  Lyons Dep. at 31:6-16.  And as noted previously, in the handheld video,

C.O. D. Cappelli can be seen using a knife to cut a towel off of Plaintiff's neck.  *See* Pierce Decl. Ex. U, Part 1 at 00:21-25.

Simply put, there is no evidence that Sgt. Lyons ordered C.O. D. Cappelli, C.O. J. Cappelli, or C.O. Sotelo to enter Plaintiff's cell for the purpose of using force—let alone excessive force—against him, or that she had any reason to know that the corrections officers would use force, let alone excessive force, against Plaintiff once they entered the cell. Regardless of whether or not the force used by the officers against Plaintiff once they entered his cell was objectively reasonable, there is no evidence that Sgt. Lyons, by her orders to open Plaintiff's cell door and to enter the cell to remove the ligature, intentionally participated in the conduct constituting a violation of Plaintiff's rights, "[knowing] of the facts rendering it illegal." *Provost,* 262 F.3d at 155.

Accordingly, summary judgment is warranted for Sgt. Lyons as to Plaintiff's claim that she, through her own individual conduct, violated Plaintiff's constitutional rights through the use of excessive force.

* * * * * * * * * *

For all of these reasons, Defendants' motion for summary judgment as to Plaintiff's Section 1983 claim for excessive force (fifteenth cause of action) is GRANTED as to Sgt. Lyons and DENIED as to C.O. J. Cappelli, C.O. D. Cappelli, and C.O. Sotelo.

### B.      Failure to Intervene (Eighth Cause of Action)

"Law enforcement officers have an affirmative duty to intervene to prevent their fellow officers from infringing on a citizen's constitutional rights." *Rodriguez v. City of New York*, 291 F. Supp. 3d 396, 406, 417 (S.D.N.Y. 2018).  "To establish a claim for failure to intervene, a plaintiff must show (i) the officer's failure 'permitted fellow officers to violate plaintiff's clearly

established statutory or constitutional rights,' and (ii) it was 'objectively unreasonable for him

[or her] to believe that his [or her] fellow officers' conduct did not violate those rights.'" *Buchy*

*v. City of White Plains*, No. 14-cv-1806 (VB), 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015)

(quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997)) (cleaned up).  "'[F]or

liability to attach' for failure to intervene, 'there must have been a realistic opportunity to

intervene to prevent the harm from occurring.'"  *Kayo v. Mertz*, 531 F. Supp. 3d 774, 799

(S.D.N.Y. 2021) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).  When the

alleged failure to intervene relates to an alleged use of excessive force, "[t]he use of force must

also have been of a sufficient duration to afford the officer a reasonable opportunity to

intervene."  *Buchy*, 2015 WL 8207492, at *3 (quotation marks omitted).

Plaintiff's failure to intervene claim as to the August 9, 2019 incident is pled only against

Sgt. Lyons.  The overhead videos show that Sgt. Lyons was standing either inside or

immediately outside of Plaintiff's cell throughout the physical altercation, and that the incident

lasted for approximately one minute, with the allegedly excessive force being applied at various

times throughout that span.  *See generally* Pierce Decl. Ex. T.  "Whether the officer had a

'realistic opportunity' to intervene is normally a question for the jury, unless, 'considering all the

evidence, a reasonable jury could not possibly conclude otherwise.'" *Terebesi v. Torreso*, 764

F.3d 217, 243-44 (2d Cir. 2014) (quoting *Anderson*, 17 F.3d at 557).  For the reasons detailed

above, there are issues of material fact as to whether the officers' use of force against Plaintiff

was excessive.  Given the duration of the incident and Sgt. Lyons's proximity to Plaintiff and the

other officers as the incident unfolded, a reasonable jury could conclude that she had an

opportunity to intervene to prevent the alleged violations.  Accordingly, summary judgment is

not warranted as to Plaintiff's failure to intervene claim against Sgt. Lyons, and Defendants' motion for summary judgment as to this claim is DENIED.

### C.      Failure to Protect (Ninth Cause of Action)

Defendants also seek dismissal of Plaintiff's Section 1983 claim for the alleged deliberate indifference of C.O. J. Cappelli, C.O. D. Cappelli, C.O. Sotelo and Sgt. Lyons in failing to protect Plaintiff from the attack by C.O.s J. Cappelli, D. Cappelli, and Sotelo.  *See* Am. Compl. ¶¶ 87-89.

"To plausibly allege a failure-to-protect claim under the Fourteenth Amendment,[15] a plaintiff must satisfy an objective prong and a *mens rea* prong."  *Scott v. Westchester Cnty.*, 434 F. Supp. 3d 188, 198 (S.D.N.Y. 2020).  "To plead the objective prong, a plaintiff must plausibly allege [that] 'the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process.'"  *Id.* (quoting *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)).  "This occurs when 'the conditions, either alone or in combination, pose an unreasonable risk of serious damage to the plaintiff's health.'"  *Id.* (quoting *Darnell*, 849 F.3d at 30 (cleaned up).  In the failure to protect context, "a substantial risk of serious harm can be demonstrated where there is evidence of a previous altercation between a plaintiff and an attacker, coupled with a complaint by a plaintiff regarding the altercation or a request by a plaintiff to be separated from the attacker."  *Id.* (cleaned up).  "To plead the *mens rea* prong, a pretrial detainee must plausibly allege 'that the defendant-official acted intentionally or

---

[15] As noted in Section III.A, *supra*, Plaintiff was held in custody at the OCCF either as a pretrial detainee or as a parole violator.  The Second Circuit has yet to determine whether parole violators' deliberate indifference-based claims are to be analyzed under the Eighth or Fourteenth Amendments.  *See Horace v. Gibbs*, 802 F. App'x 11, 14 (2d Cir. 2020) (summary order).  As with the excessive force analysis, Defendants have evaluated Plaintiff's claim using the standards applicable to a pretrial detainee, and the Court adopts this as the appropriate legal framework to apply in these circumstances.

recklessly failed to act with reasonable care to mitigate the risk that the condition posed even though the defendant-official knew, or should have known,' of the risk. *Id.* at 199 (quoting *Darnell*, 849 F.3d at 35) (cleaned up). "The Fourteenth Amendment's *mens rea* prong is defined objectively and can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Id.* (quotation marks omitted).

Defendants challenge this claim only on the ground that Plaintiff was the aggressor in the altercation on August 9, 2019, and that "an inmate's own violent tendencies are not the type of substantial risk of serious harm protected by the Constitution." Defs.' Mem. at 19 (quoting *Louis-Charles v. Courtwright*, No. 11-cv-147 (GLS) (TWD), 2014 WL 457951, at *6 (N.D.N.Y. Feb. 4, 2014)). Plaintiff's one-sentence response to this argument disputes that he instigated the altercation, and instead contends that Sgt. Lyons and C.O. D. Cappelli were the instigators. Pl.'s Mem. at 21. Although, for the reasons set forth in Section III.A.1, *supra*, there are issues of material fact regarding whether Plaintiff or the officers were the aggressors in the August 9, 2019 incident once the officers entered Plaintiff's cell, Plaintiff nevertheless cannot proceed on his failure to protect claim because the record is devoid of evidence that Plaintiff was subjected to a substantial risk of serious harm resulting from Defendants' use of force against Plaintiff, or that any of the Defendants failed to act to mitigate a known risk of harm.

"Courts have found that, when an inmate informs corrections officers about a specific fear of assault and is then assaulted, this is sufficient to proceed on a claim of failure to protect." *Beckles v. Bennett*, No. 05-cv-2000 (JSR), 2008 WL 821827, at *17 (S.D.N.Y. Mar. 26, 2008).[16]

---

[16] Though *Beckles* involved a claim pursuant to the Eighth Amendment, it has been cited by other courts in this District in cases involving Fourteenth Amendment claims for failure to

In *Beckles*, the plaintiff presented evidence that he made a sergeant at a New York State correctional facility aware of a specific threat to his safety posed by five corrections officers at the facility—specifically, Plaintiff testified that he told the sergeant "that he was afraid to return to the cell block because of the threatening behavior of the officers," he "identified the specific officers that he feared," and he "communicated to [the sergeant] his belief in the immediacy of the potential danger." *Id.* at *18.  The court determined that a reasonable jury could find that "Plaintiff's expressed concerns were sufficient to put [the sergeant] on notice of a serious risk," and denied the sergeant's motion for summary judgment as to the failure to protect claim.  *See id.*; *see also Brewer v. Jones*, No. 02-cv-3570 (NRB), 2003 WL 22126718, at * 5 (S.D.N.Y. Sept. 12, 2002) (denying summary judgment on failure to protect claim involving corrections officers allegedly failing to protect the plaintiff from assault by another officer).

Here, in contrast, there is no evidence Plaintiff ever informed any individual Defendant, or any other OCCF official, of a specific fear that any of the individual Defendants would assault him.  Moreover, even if "a plaintiff may fulfill the objective prong by demonstrating a 'generalized risk' of harm in the prison facility," *House v. City of New York*, No. 18-cv-6693 (PAE) (KNF), 2020 WL 6891830, at *12 (S.D.N.Y. Nov. 24, 2020), no evidence has been presented to suggest that any of the individual Defendants had a history of using force against inmates at the OCCF, or that the OCCF had a history of improper uses of force by its corrections officers, such that the other individual Defendants knew, or should have known, that Plaintiff faced a substantial risk of harm.  In short, there is no evidence in the record to support either the objective prong or the *mens rea* prong necessary to prevail on a claim for failure to protect.

---

protect.  *See, e.g.*, *Scott*, 434 F. Supp. 3d at 199; *Francis v. City of New York*, No. 17-cv-1453 (HBP), 2018 WL 4659478, at *4 (S.D.N.Y. Aug. 21, 2018).

Accordingly, Defendants' motion for summary judgment as to Plaintiff's Section 1983

claim for failure to protect is GRANTED.

### D.        Conspiracy (Fourteenth Cause of Action)

In the Amended Complaint, Plaintiff alleges that "Defendants, under color of law,

conspired with one another to deprive the plaintiff of his constitutional rights," and as "part of

the conspiracy," Defendants "physically and sexually assault[ed] the plaintiff while his hands

were cuffed behind his back."  Am. Compl. ¶¶ 123-24.  According to Plaintiff, Defendants acted

in furtherance of the conspiracy by, among other things, "fabricating and contriving allegations

that [P]laintiff caused his own injuries," "deliberately suppressing the truth," "submitting false

reports, statements, and testimony; refusing to conduct a proper investigation; and jointly

devising a false exculpatory version of the events of August 9, 2019."  *Id.* ¶ 125.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or

more state actors or between a state actor and a private entity; (2) to act in concert to inflict an

unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."

*Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).  "To survive a motion for summary

judgment, plaintiff's evidence of a Section 1983 conspiracy must, at least, reasonably lead to the

inference that the defendants positively or tacitly came to a mutual understanding to try to

accomplish a common and unlawful plan."  *Stein v. Janos*, 269 F. Supp. 2d 256, 261-62

(S.D.N.Y. 2003) (cleaned up).  A conspiracy claim may be barred by the intracorporate

conspiracy doctrine, pursuant to which the "officers, agents, and employees of a single corporate

entity are legally incapable of conspiring together."  *Guillen v. City of New York*, 625 F. Supp. 3d

139, 159 (S.D.N.Y. 2022) (quotation marks omitted).  While the Second Circuit "has yet to

decide whether the intracorporate conspiracy doctrine applies to conspiracy claims under

[S]ection 1983," "district courts have typically applied the logic of the intracorporate conspiracy doctrine to § 1983 claims." *Id.* at 160-61 (quotation marks omitted).  Nonetheless, "[a]n exception to the intracorporate conspiracy doctrine allows suits against individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity." *Id.* at 160 (quotation marks omitted).

Defendants contend that summary judgment is warranted on this claim based on both a lack of evidentiary support and the intracorporate conspiracy doctrine.  Defs.' Mem. at 21-23; Reply Mem. at 9-10.  The Court agrees.

First, to the extent that Plaintiff's conspiracy claim is premised on the notion that Defendants acted in concert by reaching an agreement to assault Plaintiff at some point prior to the August 9, 2019 incident, he has provided no evidentiary support for his claim.  In his opposition brief, Plaintiff argues that "the testimony that the officers fabricated their version of events in concert, raise[s] triable issues of fact as to whether there was a conspiracy," Pl.'s Mem. at 20, but he offers no citation to any specific testimony that could even arguably support this contention.  Moreover, Plaintiff has presented no evidence in opposition to the motion that would enable a reasonable jury to infer (1) that C.O.s J. Cappelli, D. Cappelli, and Sotelo agreed in advance of their entry into Plaintiff's cell to use excessive force to subdue him; or (2) that Sgt. Lyons issued a radio transmission accusing Plaintiff of "hanging up" as part of an agreement with C.O.s J. Cappelli, D. Cappelli, and Sotelo to enter Plaintiff's cell for the purpose of using excessive force against him.  Therefore, Defendants are entitled to summary judgment on Plaintiff's conspiracy claim to the extent that it is based on a premeditated plan to use excessive force against him on August 9, 2019.

Second, to the extent that Plaintiff's conspiracy claim is based on allegations that Defendants acted in concert to cover up their alleged use of excessive force, this theory is also deficient.  In Plaintiff's view, such a cover-up would fall within the "personal interests" exception to the intracorporate conspiracy doctrine, because it would be in the interests of the officers to deflect blame from themselves and onto Plaintiff for the August 9, 2019 incident.  It is not even necessary to reach the intracorporate conspiracy point, however, because of the complete and total lack of evidence of any conspiratorial conduct by the individual Defendants. In his opposition brief, Plaintiff does not cite to a single item of evidence—whether documentary evidence or deposition testimony—to support the allegation that the individual Defendants acted in concert to "fabricate the charges and evidence, omit relevant facts from reports, and ensure his malicious prosecution."  *See* Pl.'s Mem. at 20-21.  Plaintiff does not point to any particular report that he contends has been fabricated, suggest how it was fabricated, or indicate by whom it was fabricated.  To the extent Plaintiff asserts that the purpose of the alleged conspiracy was to "ensure his malicious prosecution," Plaintiff nowhere explains what charges were brought against him as a result of the purported conspiracy or what punishment he suffered as a result of any such charges.  There is no evidence in the record indicating that a disciplinary hearing ever took place or that any punishment was ever imposed upon Plaintiff as a result of any charges of misconduct associated with the August 9, 2019 incident.  Further, there is no malicious prosecution claim remaining in this action, *see* ECF No. 34 at 1, and Plaintiff's inability to "articulate the violation of a specific constitutional right that was the alleged object of the conspiracy" is also fatal to this claim. *Bertuglia v. City of New York,* 133 F. Supp. 3d 608, 641 (S.D.N.Y. 2015), *aff'd sub nom. Bertuglia v. Schaffler,* 672 F. App'x 96 (2d Cir. 2016) (summary order); *see Alvarez v. City of New York*, No. 11-cv-5464 (LAK), 2012 WL 6212612, at

*4 (S.D.N.Y. Dec. 12, 2012) (court dismissed Section 1983 conspiracy claim where plaintiff failed to allege that a constitutional violation was caused by the conspiracy).

Finally, in an argument that seems better suited to an opposition to a motion to dismiss rather than a motion for summary judgment, Plaintiff asserts that the conspiracy allegations, "if assumed to be true, plausibly suggest that the officers acted in their own personal interest, such as to avoid disciplinary action for their allegedly improper conduct, and not in the interest of the OCCF, in fabricating the evidence and charges against Mr. Ruggiero." Pl.'s Mem. at 20-21.  But at the summary judgment stage, Plaintiff must come forward with evidence—not merely allegations—in order to demonstrate a genuine dispute of material fact for trial.  *See Guillen*, 625 F. Supp. 3d at 157 (collecting cases); *Falls v. (Police Officer) Detective Michael Pitt*, No. 16-cv-8863 (KMK), 2021 WL 1164185, at *41 (S.D.N.Y. Mar. 26, 2021) ("as courts have routinely held, a plaintiff may not survive summary judgment through a conclusory assertion that relevant records were forged or falsified" (collecting cases)).

For all of these reasons, Plaintiff has not come forward with evidence that would be sufficient for a reasonable jury to conclude that any of the individual Defendants engaged in a conspiracy for any purpose.  Accordingly, Defendants' motion for summary judgment as to Plaintiff's Section 1983 claim for conspiracy is GRANTED in its entirety.

## IV.    Plaintiff's Remaining State Law Claims (First and Second Causes of Action)

Defendants' only argument for the dismissal of Plaintiff's state law causes of action for assault and battery[17] and for aiding and abetting a tort is premised on Plaintiff's failure to comply

---

[17] Because "[t]he elements of New York assault and battery and Section 1983 excessive force claims are substantially identical," *Tardif v. City of New York*, 991 F.3d 394, 410 (2d Cir. 2021) (quotation marks omitted), a substantive (rather than procedural) motion for summary judgment as to the assault and battery claim would have been denied for the same reasons set forth in Section III.A.1, *supra*.

with Section 50-h of New York's General Municipal Law, which provides, in relevant part, that "[w]here a demand for examination has been served . . . no action shall be commenced against the . . . county . . . against which the claim is made unless the claimant has duly complied with such demand for examination . . . ."  N.Y. Gen. Mun. Law § 50-h(5); *see* Defs.' Mem. at 25-26.

There is no dispute that this lawsuit was commenced before Plaintiff's § 50-h hearing was held—Plaintiff filed suit in state court on August 7, 2020, *see* ECF No. 1 (Notice of Removal), and the § 50-h hearing took place on August 21, 2020.  *See* Pierce Decl. Ex. KK. Judge Briccetti dismissed the claims in the first and second causes of action as against the County of Orange, *see* ECF No. 34 at 2; therefore, the only remaining portions of these causes of action are the claims against the individual Defendants—the assault and battery claim specifically identifies C.O. J. Cappelli, C.O. D. Cappelli, and C.O. Sotelo, and the aiding and abetting claim specifically identifies Sgt. Lyons.  *See* Am. Compl. ¶¶ 52, 56.  As to the individual Defendants, however, the timing requirements of § 50-h(5) do not apply—the statutory provision "does not refer to claims filed against officers, appointees, and employees of municipal corporations."  *Bradley v. Golphin*, No. 14-cv-4289 (NGG) (RML), 2018 WL 480754, at *4 (E.D.N.Y. Jan. 18, 2018); *Gilliard v. City of New York*, No. 10-cv-5187 (NGG) (CLP), 2013 WL 521529, at *15 n. 19 (E.D.N.Y. Feb. 11, 2013).  Thus, "[p]roperly read," § 50-h(5) does not bar claims raised against Defendants in their individual capacities "after Plaintiff's failure to attend a municipally scheduled hearing."  *Bradley*, 2018 WL 480754, at *4.

Accordingly, Defendants' motion for summary judgment as to the first and second causes of action is DENIED as to the individual Defendants identified in those claims.

**CONCLUSION**

For the reasons stated above, Defendants' motion for summary judgment is GRANTED

IN PART and DENIED IN PART.  The claims remaining in the case for trial are as follows:

 (1) Section 1983 claim for the use of excessive force (fifteenth cause of
    action) as against C.O.s D. Cappelli, J. Cappelli, and Sotelo;

 (2) Section 1983 claim for failure to intervene (eighth cause of action) as
    against Sgt. Lyons;

 (3) state law claim for assault and battery (first cause of action) as
    against C.O.s D. Cappelli, J. Cappelli, and Sotelo; and

 (4) state law claim for aiding and abetting a tort (second cause of action)
    as against Sgt. Lyons.

The Clerk of Court is respectfully directed to terminate the following defendants, as to

whom all causes of action have been dismissed as a result of this Opinion and Order: (i) the

County of Orange; (ii) C.O. Warren in his individual *and* official capacities; (iii) Jane Doe; and

(iv) C.O. J. Cappelli, C.O. Sotelo, C.O. D. Cappelli, and Sgt. Lyons *in their official capacities*

*only*.  The only remaining active Defendants in this matter are C.O. J. Cappelli, C.O. Sotelo,

C.O. D. Cappelli, and Sgt. Lyons *in their individual capacities only*.

As set forth in ECF No. 71, an in-person status conference has been scheduled for

October 31, 2023 at 10:00 a.m. in Courtroom 250 in the White Plains federal courthouse.  In

advance of the conference, counsel must meet and confer to discuss whether all parties believe

that a settlement conference would be productive, *and* dates when counsel and all relevant

witnesses are available for trial in February, March, April, or May 2024.

Dated: October 24, 2023
      White Plains, New York

**SO ORDERED.**

_____
ANDREW E. KRAUSE
United States Magistrate Judge